FIREMAN'S IN-
SURANCE CO.
*vs*
FITZHUGH, &c.

COVENANT.

# Fireman's Insurance Company of Louis-ville *vs* Fitzhugh & McConnell.

*Case 37.*

APPEAL FROM THE JEFFERSON CIRCUIT.

*Insurance. General and particular average loss.*

*October 9.*

JUDGE MARSHALL delivered the opinion of the Court.

Case stated.

THIS action of covenant was brought by Fitzhugh & McConnell against the Fireman's Insurance Company of Louisville, to recover for losses sustained by them on their interest of one-fourth, in the steamboat William French. The policy, bearing date the 24th day of Octo-ber, 1840, insures them for one year, in the sum of $3000, on their interest of one-fourth, the whole boat being valued at $15,000, warranted by the assured free from average under ten per cent. and to be employed in navigating the Ohio and Mississippi rivers and their tribu-taries. On the 25th of October, 1840, the boat being opposite to Flint Island, in the Ohio river, with no prop-erty freighted on board except some feathers, &c. not worth more than $200, struck a snag in the river, while rounding to, by which twenty-six of her timbers were broken, and the water, in large quantities, let in, in consequence of which, she was run on a flat shore, grounding her bow in five feet water, which was about the depth she drew, and her stern in eight feet water; every exertion having been made by the officers and crew, of about twenty hands, to keep her afloat. On the next day extra pumps were made of dunnage plank and bucket plank from the wheels, and holes were made in the deck for the purpose of using them; a boat builder was also sent for, by whom the boat was raised; fifty-one blankets of the boat having been used and injured in making bulk-head; and there being no convenience for repairing her

at the place of accident, she was taken up to Louisville and there placed in dry dock and repaired, the whole costing less than to have had her put in the proper situation and the repairs made at the place of accident, if indeed that could have been done. It appears too, that had there been a delay of a few hours longer in raising the boat, it would have been much more difficult and expensive, if not impracticable, in consequence of a rise in the river, and the sediment which would have settled in her.

The materials and work directly applied to the repair of the damage occasioned to the hull of the boat by the accident, were worth,

Amount claimed by plaintiffs, the insured.

| | |
|---|---|
| The materials and work directly applied to the repair of the damage occasioned to the hull of the boat by the accident, were worth, | $ 551 07 |
| The residue of the boat builders account, being for services of himself and four hands in going down and raising the boat, was | 464 00 |
| The damage done to the rigging by the accident, was | 20 00 |
| Other extraordinary expenses occasioned by the accident were, for extra hands to pump, $6 25, for use of flat boat $2, | 8 25 |
| For wood consumed from the time of the accident until the repairs were finished, | 72 00 |
| Stores, (i. e. provisions,) used during same time, | 350 00 |
| Wages of the officers and crew, for five days, from the time of the accident until the boat was put into the dry dock, | 250 00 |
| Wages of captain, mate and two deck hands while the boat was in dock undergoing repairs, | 35 00 |
| Four days' dock fees, | 265 00 |
| Damage to 51 blankets used and injured in raising the boat, | 31 88 |
| Bucket plank for making pumps $10 20, dunnage plank $8, | 18 20 |
| Iron, nails and leather for pumps, | 15 00 |
| For repairing deck $5, repairing wheels $5, | 10 00 |
| Protest and magistrate's fee, | 5 31 |
| | $2095 71 |

The aggregate amount of these items being the sum of $2095 71, is alledged by the insured, to be the true measure of the loss sustained by and on account of the boat, in consequence of the accident. And having been insured to the extent of four-fifths of one-fourth of the entire boat, they claim to recover the same proportion, that is, one-fifth of the entire loss. The Circuit Court, (the law and the facts having been submitted to the Judge,) rendered a judgment in their favor for $408; from which the Insurance Company appealed to this Court.

The objections to. the judgment rest on three general propositions, which we shall proceed to state and dispose of in the order in which they are applicable to the subject.

1. It is assumed by the counsel for the insurers, that the word "average," as used in the warranty contained in the policy, means particular average, that the effect of the warranty being, therefore, to exempt the insurers from liability for any particular average, not amounting to ten per cent. on the value of the boat, that rate of loss cannot be made up by adding any general average charges to the particular average. Perhaps no part of this proposition is questionable, except that which gives to the word average, as used in the warranty, the same import as if it had been preceded by the word "particular" or "partial," or had been followed by other expressions which would exclude general average. There being two sorts of average for which insurers are liable, viz: general and particular, it would seem, according to the common use of language, and the ordinary rules of construction, that the general word "average," used in the policy, without adjunct or qualification, should be understood in a comprehensive sense, as including both species; and if so understood, we should not doubt that both species should be taken into the estimate in ascertaining whether the rate of loss is within the warranty, and therefore, within the exception which it makes to the liability assumed by the insurers, in their general undertaking contained in previous parts of the policy. This import of the word "average," may be restricted by the context or

by usage, applicable to the subject: but there is nothing in the policy, out of the warrant itself, indicating any restriction; and the record contains no evidence of a usage among merchants or insurers, by which the word, standing alone in the warranty or memorandum, is to be understood as equivalent to particular average. Indeed, the word "average," standing alone, often, perhaps most frequently, means general average. Looking, however, to the origin of the memorandum or warranty, and the cause and object of its introduction into policies, which was to prevent the insurer from being chargeable for such deterioration in the subject insured as might arise from its inherent qualities, or otherwise than from the perils insured against, it may be that the word "average," standing alone in the memorandum or warranty, should be understood as referring only to such partial loss as falls upon the particular subject referred to in the warranty, which is, in effect, particular average. And there may be, though we have no sufficient evidence, either in the facts before us, or in any authority to which we have been referred, that there is a corresponding usage which authorizes such a construction in this case.

For reasons, however, which will appear in the course of this opinion, we do not think it necessary to decide this question in the present case. But assuming that the word "average," in the warranty, is equivalent to particular average, we will only remark further, with regard to the warranty, that as upon this construction, it does not exempt the insurers from liability for general average, the plaintiffs might recover for any general average loss, however small, though there could be no recovery for particular average losses, in consequence of their not amounting to ten per cent.

2. As upon this construction of the warranty, there can be no recovery for any particular average or partial loss on the subject insured, unless such partial loss amounts, in the aggregate, to $1500, which is ten per cent. on the total value of the boat, it becomes important to ascertain what portion of the loss, as exhibited in the foregoing account of loss or expenses, is properly chargeable as particular average, which term must, in this in-

*FIREMAN'S INSURANCE CO. vs FITZHUGH, &c.*

*Where the warranty in a policy is to indemnify against average loss, the insurers are liable for general average loss, however small.*

FIREMAN'S IN-
SURANCE CO.
vs
FITZHUGH, &c.
quiry, be understood as referring only to such partial losses as the insurers, were it not for the warranty, would be liable for under their general undertaking of insurance. In view of this inquiry, it is contended that several of the smaller items, as those for bucket and dunnage plank, taken for making pumps, and the injury to the blankets used in partially stopping the leak, and others of like nature, are properly general average charges; and that the larger items for provisions and wages of the crew, from the time of the accident, are not chargeable against the insurers at all, or if so chargeable, constitute general average and not particular average charges; and that, as in either case, these latter charges must be excluded in estimating the particular average loss under the warranty, whereby the aggregate will be reduced below $1500, there can be no recovery for any part of the particular average or partial loss on the boat.

General average defined.

It is necessary to a correct understanding of the questions involved in this proposition, to have a true notion of what is meant in the law of insurance by the terms general and particular average. The term general average implies a case in which, according to natural justice, there should be a contribution, by all concerned, to make good a loss incurred by a part for the common benefit. The simplest instance is that of a jettison, where the goods of one person interested are thrown overboard in order to save the vessel and every thing that is at stake in it. In such case, every interest which is thus bene-fitted, the ship, the freight and the residue of the cargo, must contribute to make good the loss—and this is general average. It may be comprehensively defined to be an expense or sacrifice voluntarily incurred on account of the ship, freight and cargo, to save them from impending danger, threatening the whole, and which being incurred by, or at the expense of the owner of one of them, entitles him to contribution from all: (1 *Phillips on Insurance*, 331, &c. *Benecke on Marine Insurance*, 165-6.)

Particular aver-age defined.

Particular average is a damage happening to the thing insured, or an expense incurred exclusively on its account, occasioned by the perils insured against, and when such damage or expense is not in the nature of a sacrifice for

the common benefit: (1 *Phillips on Insurance*, 369; *Ben-ecke, ubi supra*.)

It is not denied that the injury to the hull and rigging of the boat was occasioned immediately by one of the perils insured against, and therefore comes directly within the general undertaking of the insurers; nor can it be denied, under these definitions, that being a damage to the subject of insurance, incurred not voluntarily for the benefit of all concerned, but fortuitously from one of the perils of the river, it is properly a particular average. But how is the extent or value of this damage to be estimated—or in other words, how is the loss produced by the accident to be ascertained? Mr. Phillips in his treatise on insurance, vol. 1, page 370, says: "In case of partial loss on the ship, the underwriters are liable to pay for the damage sustained, the amount of which is calculated upon the expense of repairs, in case of the owners choosing to repair the ship, otherwise the amount of damage is a subject of estimation." And again, page 372: "The expense of repairs and the amount of expenditures occasioned by the perils insured against being ascertained, their sum constitutes the loss." Does the expense of repairs which constitutes the loss, and which the underwriters are to pay, include merely the costs of labor and materials directly applied to the repair of the injury? or does it not also include all incidental expenses incurred necessarily and exclusively for the purpose of putting the ship in a condition to be repaired? Are not all such expenses incurred exclusively on account of the subject insured, and occasioned directly and necessarily by one of the perils insured against, when they are incurred necessarily and exclusively for the purpose of repairing an injury done to the subject by one of those perils? And do they not come directly within the difinition of particular average and fully up to it, when they are so incurred for the repair of a damage which is itself a subject of particular average?

It is not the mere naked act done, or the mere name which may be given to a particular loss or expense that is to determine either whether the insurer is responsible, or if responsible, whether it is to be for general or particu-

All the expenses attending a loss enter into the question whether it be a *general* or *par-*

FIREMAN'S IN-
SURANCE CO.
*vs*
FITZHUGH, &c.
ticular average
loss.

lar average. The law of insurance regards, in a peculiar manner, the circumstances existing at the time, the cause of the loss, and if it be voluntary, its intent, object and effect. The injury done to a sail or other part of the apparrel of a vessel by using it to stop a leak; the injury done by taking materials from one part of a vessel to repair or prevent a damage to another, and the injury done by cutting holes in the deck or sides of the vessel, for the purpose of taking out the cargo or letting out sea water, &c. constitute general average charges, when the several acts referred to are done under circumstances of danger and in order to save the vessel and all on board, or for the common benefit and safety; and as these acts when done at sea are generally, perhaps always, done under the circumstances and with the motive which characterize a general average, they are commonly spoken of as making general average charges. But the same acts when done under different circumstances, and for a different purpose, have a different character themselves and must give a different character to the loss which attends them.

Expenses incur-
red in raising a
vessel, placing
her in a condition
for repair and re-
paring her, fall
under the de-
nomination of
particular aver-
age.

If then the blankets of the boat, and the bucket and dunnage plank were used, and the holes were cut in the deck, not for the purpose of saving the boat and crew and cargo from a common danger, but for the mere purpose of getting up the boat, so that she might be repaired, the losses occasioned by these acts cannot be general average, because they want the essential ingredients of common danger, and of a motive directed to the common benefit to make them so. And so of every expense necessarily incurred in raising the boat and taking her up to Louisville, and there putting her and keeping her in the dock to be repaired. If they were incurred exclusively on account of the boat, that is, merely for the purpose of putting her in a condition to be repaired, and not with a view to the common safety and benefit, they cannot constitute general average charges. Let us then recur to the facts.

It may be assumed that when the boat struck the snag, by which she was injured, she was in deep water, and would have sunk if she had not been run towards the shore. This measure, therefore, may be said to have been properly and voluntarily adopted for the common

benefit and safety; and if any injury or expense had been incurred in carrying it into effect, these ingredients of general average would not have been wanting.  Whether, under all the circumstances, such a loss would have been a general average, is a question not arising in this case, because there was no such loss.

But when the boat was aground in five feet water at her bow and eight feet at her stern, all danger of sinking was at an end.  If she had sunk in deep water, the unloading of the cargo might (if she had been more heavily freighted,) have been essentially necessary for raising her, and in that case, or at any rate, if unloading the cargo had sufficed to raise the boat, and she was to be repaired, the expense of unloading might have been a case for contribution as a general average, if the cargo was also benefitted thereby; or if the raising of the boat had been essential, not only to its safety and repair, but also to the unloading of the cargo and the prevention of further injury to it, the expense of raising the boat might, perhaps, have been a general average.  But if the cargo was unloaded for its own preservation merely, and not for the benefit of the boat, or if the boat were raised for its own benefit only, and not for the benefit of the cargo, there would be no case for contribution and no general average for the expense of unloading in the first case or of raising the boat in the last.  It does not, in fact, appear whether the cargo was taken out of the boat or not.   There is no charge for unloading it, and therefore, no question in this case as to the true nature of such a charge—nor does it appear either that it was necessary to unload the cargo in order to raise the boat, or to raise the boat in order to unload the cargo, and considering the nature and trifling weight of the latter, and the probable manner of stowing it, there is no presumption of such necessity, and therefore, no reason on this ground, for making the cargo contribute to the expense of raising the boat.  If the cargo was in danger of further, or of any injury from remaining on board, the presumption is, that it was unloaded and either stored on shore to await the return of the boat after it should be raised, taken to Louisville and repaired, or that it was put on another boat for transportation to its

If unloading is necessary to the raising a vessel for repair, the expense is general average. But if the cargo is unloaded merely for its own benefit, it is not a general average charge.

destined port; or if it remained on board and was taken up to Louisville, and thence transported to its original destination, still the expense of raising the boat and taking her up to Louisville, was not incurred with any view to the benefit of the cargo, but for the purpose of repairing the boat; and whether it remained in the boat during the whole time, or was stored on shore at the place of accident, and taken on board as the boat returned on her downward trip, it received no other benefit from the repairs, and all the expense incurred in raising the boat and taking her to Louisville and back, but the equivocal benefit of being carried on in the same boat in which it was at first received. And this benefit is no cause of contribution, because all the expense was incurred for the purpose of repairing the boat, which the owner of the cargo had a right to require from the owner of the boat, unless the latter gave up the voyage and the freight; and because it was a sufficient burthen upon the owner of the cargo, that he was bound to await the repairs or to pay the freight: (*Benecke on Marine Insurances,* 193–4.)

If the boat had been fully freighted, and the cargo could have been taken out without raising the boat, it may be regarded as entirely certain that this would have been done, and that the cargo would not have been left on board, to impede either the raising of the boat or her navigation to Louisville. In which case it would have been perfectly clear, that the cargo would have received no benefit from any of the expenses now in question, but that of being again taken on board and transported to its original destination. The presumption is, that the cargo in this case, was unloaded for its own safety, which would certainly have been endangered by keeping it on board of a disabled boat while it was being raised, and during its navigation up to Louisville. But if it was retained on board, it was certainly not for its own safety or preservation, but only because it would not sensibly obstruct the raising or the navigating of the boat; and in either case, the cargo was not bound to contribute.

We are satisfied, therefore, that the entire expense,
Expenses incur-
red in raising,
removing and re-
labor and loss incurred in raising the boat, taking her up to Louisville and there having her repaired, were incurred

exclusively for the benefit of the boat and on her account, and not to any extent on account of the cargo, nor even on account of the small freight which might become payable on the delivery of the cargo at its port of destination. There is indeed, no proof that the cargo was either retained on board or received again as the boat went down from the place of repair, and looking to the frequent opportunities of transhipment afforded by the almost daily passage of boats, and to the danger of either retaining the cargo on board of a disabled boat, or of leaving it on the shore at the place of accident, where it does not appear that there was any safe place of deposit, it might, perhaps, be a reasonable presumption that it was transhipped, and therefore, that there was no further connection between it and the William French. But be this as it may, there is no presumption that any of the expenses now in question were incurred with a direct view to the freight payable on the cargo then on board, nor that the voyage itself was either undertaken or prosecuted for the purpose of carrying that freight. The boat was a regular passage boat up and down the waters of the Mississippi and Ohio. And if it were not so, the mere circumstance that by repairing the boat the cargo might be carried on, and the freight thus carried no more binds the freight to contribution than it binds the cargo, the delivery of which entitles the boat to the freight.

There being then no item of loss or expense in this case which can constitute a general average charge, because there was no loss or expense incurred for the purpose of avoiding a common danger, or securing a common benefit, but all being incurred solely on account of the boat, and for the purpose of repairing an injury done to it by an accident arising from one of the perils insured against, all being such as would not have occurred, or at least, would not have constituted a loss but for the accident; all being, therefore, extraordinary in their character, and the whole amount being less than it would have cost to repair the boat at the place of accident, it would seem to follow, upon principles of justice and according to the nature of the contract of insurance, which promises indemnity against loss or damage to or on account of

FIREMAN'S INSURANCE CO.
vs
FITZHUGH, &c.

pairing a steam boat which had sunk, with only a few thousand pounds of wool on board, was a particular average loss, and with any part of which the cargo was not chargeable.

the boat, by any of the perils enumerated in the policy, that every part of this loss should fall upon the insurers, under their general undertaking of insurance, and as a particular average. There is no room for questioning this conclusion except as to the charges for wages and provisions, &c. consumed after the happening of the accident— indeed these are the only charges which the insurers contend are not embraced within the general terms of the policy. And while we have been referred to British authorities to prove that these charges should not fall on the insurers at all, but must be borne by the owner of the boat, without hope of remuneration, except from her future earnings, we are also referred to American authorities to prove that if chargeable to the insurers, they constitute general average. But the American cases do not apply to prove this position, because they are cases in which the port or place of repair is sought not only for the purpose of repair, but also for the general benefit, and to avoid the danger which threatened the whole concern, if the vessel be not repaired; and on that ground, the loss of wages and provisions consequent upon the deviation and delay, are held to be general average. But in this case there was no common danger, for avoiding which this extraordinary expense of wages and provision was incurred. The British cases too, which deny the liability of the insurer on the ship are, so far as we have been able to consult them, unlike the one before us, some of them are cases in which the claim was for provisions and wages during a detention by embargo, as in *Robertson* vs *Ewin*, (1 *Term Rep.* 128; and *Eden, &c.* vs *Poole*,) cited in the same case; and although the embargo was one of the perils insured against, yet the liability was denied, because the insurance was on the body of the ship, and that was uninjured. Here the body of the boat, the subject of insurance, was injured by one of the perils insured against, and the expense now in question was incurred, not only in consequence of that injury, but directly and exclusively for the purpose of repairing it. Justice Buller, it is true, said in that case, that if the ship had been detained in consequence of an injury received in a storm, the underwriter, though bound to make

good that damage, would not have been liable for wages and provisions, expended while she was repairing; and the liability of the insurer for wages and provisions of the crew during a detention at 'Liverpool, for the purpose of repairing, after she had discharged her cargo, was also denied in the case of *Dunham* vs *Com. Ins. Company*, (11 *Johnson's Rep.* 320.) In other cases in which there is no ground for making the claim for this loss or expen-diture a general average charge, the liability of the insurer is denied in England, on the ground that the owner of the vessel is bound to keep and maintain a crew, and must look to freight for remuneration, and in both coun-tries it has been denied, when in the particular case no such expense was necessary.

But here the claim is for wages and provision expended, not merely during the repairs, but in taking the boat to the place of repair, when, as we suppose, the owner was not bound to navigate his crippled boat to Louisville, at his own loss and for the benefit of the insurers. When, therefore, although the expense of wages and provision may not have been necessary in that form, it comes in place of a greater expense which would certainly have been chargeable to the insurer; and when, although it be admitted that the owner was bound to take the boat to Louisville to be repaired, because it was cheaper to take her there and there repair her, than to repair her where she was, this obligation arose from his duty under the cir-cumstances, to act for the benefit of the insurers, and does not imply that he was to take her there at his own loss any more than that he should repair her at his own loss. If he was bound to furnish a crew for this part of the nav-igation, which was no part of the original voyage, but was undertaken solely for the purpose of putting the boat in a condition to be repaired, he was so bound on the same principle that he was bound to procure laborers to raise the boat, and to do whatever else might have been necessary to put her in a condition to be repaired, if she had been repaired on the spot. Suppose the case had been, that although it would have cost more to have re-paired the boat where she was than to have repaired her at Louisville, if she had been there, the difference was

not equal to the expense of taking her there, would the owner have been bound, at his own expense and loss, to have sought the cheaper repairs for the benefit of the underwriters? Most assuredly he might have repaired at the place of accident, and have saved the expense of the *extra* navigation, and the insurer must have paid the higher costs of repairs. And must the owner lose this expense when it is less than the difference in the cost of repairs at the two places, because having the actual management and control of the boat, for the benefit of all concerned, and being bound to regard the interest of the insurers, he takes the boat to the cheaper place, not for any advantage to himself, but for the sole purpose of having her there repaired? There is certainly no ground, in reason or justice, for saying that he must. And as we think there is no ground in the law of insurance, nor in any authority pointing directly to such a case, for exempting the insurers from paying a loss thus incurred for their benefit, why should the expense of raising the boat for the purpose of repairing her be charged to the insurers and not the other expenses incurred solely for the purpose of taking her to the place of repair? Or why should the expense of putting her and keeping her in the dock to be repaired, be so charged, and not the expense of taking her to the dock, when this expense was incurred necessarily, or what is the same thing, advantageously to the insurers, for the same exclusive purpose? Or why should the wages and provisions of the crew stand upon peculiar ground? There is no reason pretended to be given, but the nominal one as it applies to this case, that the owner is bound to furnish and maintain a crew to navigate and take care of the vessel during the whole voyage, and therefore, during the detention occasioned by an accident; and that the wages and maintenance of the crew being thus an ordinary expense, the increase, though occasioned by an extraordinary accident, against which the owner is in. sured, is still but an ordinary loss or expenditure, which, like the ordinary wear and tear of the boat, is not covered by the policy. But can that expense which, though ordinary in name, is incurred under extraordinary circumstances, not in the course of the voyage, nor with the or-

dinary object of the navigation, which is to earn freight for the defraying of ordinary expenses and losses, but for a navigation out of the common course, rendered necessary by an injury insured against, not yielding any freight but undertaken for the sole purpose of repairing the injury in a manner most advantageous to the insurers; can such an expense be properly regarded as an ordinary loss, to be placed on the footing of ordinary wear and tear, or of the ordinary expenses of the boat, which the owner must exclusively sustain? It seems to us most clearly that it cannot, but that although when incurred under ordinary circumstances, it is an ordinary expense devolving upon the owner of the boat, under his duty both to the freighter and the insurer, it becomes an extraordinary expense under the circumstances just referred to, and being, in fact, a loss occasioned by the accident, and a part of the incidental and extraordinary costs of repairing the boat, it must be regarded as a part of the loss within the policy.

Mr. Phillips, in his work before referred to, vol. 1, page 252-3, after stating that it is universally held, that if a vessel go out of her course for the purpose of repairing damages sustained by one of the perils insured against, this is to be done at the charge of the insurers, but that they are chargeable only with the extraordinary expenses, and not with the ordinary expenses or losses, among which he ranks the loss of the earnings of the vessel during the time of the delay—notices the English rule exempting the insurer, both of the ship and freight, from the expense of wages and provision of seamen, and states that in the United States the rule is general and uniform, that the underwriters are, in this case, liable for this expense besides the adjudged cases referred to, and he states, in page 346, a case in which the underwriters paid, without dispute, the expense of a delay at sea for the mere purpose of repair, which tends to show what is understood to be the rule in the United States. In page 253 he suggests that "one reason of the rule (in the United States) seems to be, the extraordinary circumstances under which this expense is incurred, which may be supposed to change the nature of these expenses, and to render the insurers liable for them on the same principle on which they are

liable for any other loss." This as well as the alternative reason which he goes on to state, seems to us to be a substantial reason, and especially in its application to our western steam boat navigation, and to the particular circumstances of this case.

In consequence of the nature of our navigation, the duration of the voyages or trips of a boat up and down our rivers, and the period of her arrivals and departures are almost as certain, under ordinary circumstances, and in the absence of extraordinary accidents, as the arrivals and departures of the ordinary vehicles of transportation on land—a state of things which has only been approximated within a few years by steam navigation on the ocean, and is signally different from the circumstances under which the general laws of insurance grew up, and to which some of them seem to be peculiarly applicable. When to this character of our navigation is added the fact, as we understand it, that the crew is engaged by periods of time and not by the voyage; and that the certainty of the trips in regard to time, enables the owners of the vessel to regulate the freight and wages, &c. with such reasonable certainty as to avoid loss under ordinary circumstances ; while he takes an insurance to avoid loss under extraordinary circumstances, which, as he cannot foresee, he cannot take into the calculation in regulating freight and wages, it is obvious that the expense of wages and provisions during a delay occasioned by an accident insured against, may, in all cases, be regarded as an actual loss occasioned by the accident, extraordinary, because it is thus occasioned, and which ought to be borne by the insurer because of these circumstances, and because it being impossible to provide a remuneration for this loss by regulating the freight so as to meet it, or in case of wear and tear and other ordinary expenditures, this is in its nature the very kind of loss, or one of the losses for indemnity against which the owner must be supposed to seek an insurance and to look to the insurer.

But as already said, the main question here is not merely on account of the expenses occasioned by delay, but principally on account of expenses incurred for the purpose of repair ; and although the expense of a small

part of the wages and provision charged, not exceeding in the aggregate amount $70, was incurred while the boat was in the dock; this expense, were it even excluded from the account, because it is not supported by all the reasons which support the other part of the charge, and may not have been incurred for the benefit of the insurers, or as a part of the cost of repairs, would neither reduce the particular average below the ten per cent. mentioned in the warranty, nor reduce the sum to which the plaintiffs were entitled below the amount of the judgment. We need not, therefore, discriminate even if there be ground for discrimination in respect to this part of the charge, but conclude that none of the items should be rejected from the particular average.

3. But it is contended further, that if all the items of the account are in regard to their respective subjects, properly chargeable as particular average, they are only so chargeable on the ground that they are a part of the cost of repairs; and that as by the universal rule among commercial nations of making up the account of loss between the owners and the insurers of the vessel, one third is deducted from the aggregate cost of repairs on account of new materials being put in the place of the old; and the insurer is charged with two-thirds only as being the actual loss sustained by the owner; two-thirds only of the gross sum of all these charges should be charged as the actual loss, in this case, which being less than ten per cent. on the total value of the boat, it is insisted that there cannot be a recovery under the policy. But the rule, if applied at all to the adjustment of losses on steam boats navigating our western rivers, does not go to the extent contended for; it is founded upon the idea that the vessel is certainly benefitted by the repairs; that is, that she is better after the repairs than she was before the accident; and as the insurer is bound only to indemnify against the loss occasioned by the accident, and not bound to make the vessel better than it was before, he should only be charged with so much of the expenses of repairs as goes to restore the vessel to its former condition, and not with so much as goes to its actual improvement. To avoid the vexations of making this dis-

<div style="margin">FIREMAN'S INSURANCE CO.<br>vs<br>FITZHUGH, &c,</div>

<div style="margin">Is the whole amount of the expenses of repairing a steam boat snagged, to be borne by the insurers, or only two-thirds as the rule is in respect to sea vessels repaired?—*Query.*</div>

crimination in every case according to its circumstances, and because perhaps long observation in regard to the nature of the injuries to which sea vessels are exposed, and the effect of repairs as enabling them to withstand such injuries, may have indicated that one-third is a fair average allowance for the degree of improvement occasioned by substituting new for old materials: but principally, as we believe, with a view to the convenience of having a fixed rule on the subject; the rule in question has been generally adopted in measuring the loss to the owner by the costs of repairing the ship. But as the principle of the rule cannot be extended further than to the cost of materials and labor directly applied to the repair of the injury, so the rule itself must stop short at the same limit. The rule is accordingly laid down with this limitation by Mr. Phillips, vol. 1, page 371, and if applicable at all in this case, it can only be applicable to the direct costs of the repairs, and not to the incidental or extraordinary expenses. Applying the rule to this extent, and deducting from the gross amount of charges one-third of $551 07, the direct cost of repairs, the remainder will still exceed considerably, $1500, ten per cent. on the total value of the boat, so that even then the plaintiffs are entitled to recover. And as one-fifth of that sum, with interest thereon from the end of sixty days after the accident, when the loss was payable, up to the rendition of the judgment, exceeds the amount adjudged to the plaintiffs, and is about equal to it even after deducting the expense of wages and provisions while the boat was in dock; it is not necessary for sustaining the judgment, that we should decide whether the direct cost of repairs were subject to any such deduction. It was, in fact, made by the Circuit Judge. If he was wrong, the consequence would be that the judgment might have been a few dollars larger than it is.

But although it is not necessary to decide, and we do not mean to decide this question in the present case, we deem it proper to say, that upon the evidence in this record stating positively that the boat was not as good after the repairs as before, and that our steam boats are not benefited by repairs as sea vessels are, we certainly

should not feel authorized to decide that there should be a deduction of one-third, new for old, in ascertaining the loss of the owners, unless bound by authority to do so. And as there are numerous and manifest differences between the case of a sea vessel, fitted for navigating the ocean, and a steam boat engaged in navigating our inland rivers, differences not only in their construction and various appendages, but also in the manner of their navigation and the nature of the dangers which they have to encounter, and of the injuries to which they are liable— which may all be entitled to consideration in determining whether a steam boat seriously injured is in fact susceptible of being made better by ordinary repairs, than she was before the injury, we are not prepared, in the absence of any authority directly upon the question as applicable to the repairs of our western steam boats, and in the absence of any evidence going to show that the general effect of such repairs is to improve the boat, to admit either that the rule which has been mentioned is binding here, because it has been adopted elsewhere in regard to a different subject, or that it is necessary or just to establish any fixed rule on the subject. But we leave the question which, so far as we know, has never been decided in any of the western States, or any where with reference to a similar navigation, to be decided when it shall be necessary to decide it, with such lights as further experience and observation, and the evidence then adduced as to fact or usage may afford.

The judgment is affrmed.

*Duncan* for appellant: *Guthrie* for appellee.